```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 23, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                               :

UNITED STATES OF AMERICA        :

                            :     15 Cr.101 (KBF)

   - v. -                         :

                            :     OPINION & ORDER

KENNETH LEVIN,                 :
TAYLOR LEVIN,
SEARS HOBBS                    :
  a/k/a "Karen White,"
  a/k/a "Kelly Chase,"           :
JAMES CONLEY,
MARCEL HARRIS,               :
STEPHEN FRIEDMAN, and
JONATHAN CAMPBELL,         :

                            :

              Defendants.    :
------------------------------------------------------------------X

**KATHERINE B. FORREST**, United States District Judge:

       The Court has before it defendant Kenneth Levin's motion to suppress certain evidence. (ECF No. 82.) Defendants Taylor Levin, Sears Hobbs, and James Conley have moved to join Kenneth Levin's motion to suppress.[1] (See ECF Nos. 92, 93, and 85, respectively.) Levin argues that information necessary to a determination of probable cause was deliberately or recklessly omitted from the affidavit that supported the warrant to search his business, and thus that the evidence seized

---

[1] "Fourth Amendment rights are personal rights ... [that] may not be vicariously asserted." United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002) (alteration and omission in original) (quoting Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)). An employee of a corporation who seeks to challenge to challenge a search of corporate premises and records must demonstrate his standing to do so by making "a sufficient showing of a possessory or proprietary interest in the area searched." United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990). Although Sears Hobbs apparently worked from a private office at United Marketing, see O'Connor v. Ortega, 480 U.S. 709, 718-19 (1987) (recognizing a doctor's standing to assert a Fourth Amendment challenge to a search of his private office), Taylor Levin and James Conley have not demonstrated that they had a possessory or proprietary interest in United Marketing's premises and thus do not have standing to challenge the search of those premises.

1

pursuant to that warrant should be suppressed or, at the very least, that a Franks hearing should be held. The Court disagrees and DENIES the motion.[2]

The Court has reviewed in their entirety each of the transcripts of the recordings that provided much of the basis for the challenged affidavit. Based on that review, it is clear that the affidavit did omit information it would have been better to include and, in light of the totality of the references to and statements by Kenneth Levin in the transcripts, did paint a misleading portrait of the extent of his knowing involvement with the alleged conspiracy. It appears to the Court that the affidavit was framed primarily based on the affiant's prior general experience with fraudulent schemes relating to potential business opportunities without sufficient attention to possible differences here. While some of that background was no doubt useful, it may have led the affiant to try to fit the facts from the transcripts here into a mold to which they were not entirely suited. With that said, however, taken as a whole, the transcripts provided a sufficient basis for probable cause to search the business's premises.

I.  INTRODUCTION AND FACTUAL BACKGROUND

On April 25, 2011, Postal Inspector Cesar Cerecedo applied for a search warrant for the offices of United Marketing Associates Corporation ("United Marketing"). (ECF No. 83-1.) Inspector Cerecedo included a sealed affidavit in support of the application. (Id.) It is this affidavit that Kenneth Levin now argues omitted material evidence that would have undermined probable cause.

---

[2] To insure adequate time on counsel and the Court's respective calendars, time had been set aside for such a hearing. As that hearing is no longer required, that time may be released.

A schedule describing the property to be seized was attached to the affidavit. (Id.) This schedule identified certain "information, records and data" that were "created, dated, or in effect from May 2000 to the present" as the property to be seized. (Id.) The schedule clarified that the warrant was for records from United Marketing as well as other corporate entities through which it had previously done business. (Id.)

On the basis of the information included in the affidavit, Magistrate Judge Theodore H. Katz issued a warrant to search United Marketing's offices in Manhattan. (ECF No. 83-2.) Judge Katz adopted the schedule for property to be seized Inspector Cerecedo had proposed. (Id.)

The search of United Marketing's premises occurred on April 28, 2011. On February 23, 2015 a grand jury indicted the defendants in this case on charges of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.

Kenneth Levin now moves to suppress the documents seized pursuant to the warrant Judge Katz issued and any fruits of those documents. He alleges that Inspector Cerecedo deliberately or recklessly omitted material facts from the affidavit that undermined Judge Katz's determination of probable cause. (ECF No. 82.)

II.  LEGAL STANDARDS

  A.  The Charged Crimes

"[T]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (all but first alteration in original) (quoting United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996)).  A fraud conviction under 18 U.S.C. §§ 1341 or 1343 must be based on a false representation "directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." United States v. Regent Office Supply Co., 421 F.2d 1174, 1179 (2d Cir. 1970).

"Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent. . . .  Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants <u>contemplated</u> some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987).

  B.  Probable Cause

"A police officer has probable cause to conduct a search when 'the facts available to [him] would warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." Florida v. Harris, 133 S. Ct. 1050, 155 (2013) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). The analysis follows a "practical and common-sensical standard" that considers "the

4

totality of the circumstances." Id. "In considering the quantum of certainty required, it is only a probability, and not a prima facie showing of criminal activity, that is the standard of probable cause." United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983). "While probable cause requires more than a mere suspicion, of wrongdoing, its focus is on probabilities, not hard certainties. . . . It requires only such facts as make wrongdoing or the discovery of evidence thereof probable." Walczyk v. Rio, 496 F.3d 139, 156-57 (2d Cir. 2007) (internal quotation marks and citations omitted).

The Second Circuit has stated, in an unpublished summary order, that "[p]robable cause must extend to every element of the crime for which a person is arrested." Alhovsky v. Paul, 406 F. App'x 535, 536 (2d Cir. 2011). Some Circuit Courts have reached opposite conclusions. See, e.g., Hawkins v. Mitchell, 756 F.3d 983, 995 (7th Cir. 2014). The Ninth Circuit does not require "probable cause for every element of the offense" before an arrest, but does require that the police "have probable cause for specific intent when it is a required element." Edgerly v. City & Cnty. of San Francisco, 599 F.3d 946, 953 (9th Cir. 2010).

C.  Search Warrant Particularity

The Constitution requires that warrants "particularly describe[e] the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. "In order to prevent a 'wide-ranging exploratory search,' the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." United States v. George, 975 F.2d 72, 75 (2d Cir. 1992) (quoting Maryland v. Garrison, 480 U.S. 79, 84 (1987)). "When the

5

criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." United States Postal Serv. v. C.E.C. Servs., 869 F.2d 184, 187 (2d Cir. 1989).

D.  The Standard For Suppression Under Franks v. Delaware

"[A]lthough a presumption of validity attaches to a law enforcement affidavit, in certain circumstances a defendant is entitled to a hearing to test the veracity of the affiant's statements." United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008). The Supreme Court has held that this hearing is required "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978). "The Franks standard is a high one." Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991).

"[O]missions 'are governed by the same rules' as misstatements." United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013) (quoting United States v. Coreas, 419 F.3d 151, 155 (2d Cir. 2005)). "While 'the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause,' he must 'not omit circumstances that are critical to its evaluation.'" McColley v. Cnty. of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014) (internal quotation marks omitted) (quoting Walczyk, 496 F.3d at 161). Indeed,

6

"[r]ecklessness is inferred when the omitted information was 'clearly critical' to the determination of probable cause." Id.

The Second Circuit has explained that in order to determine whether a particular omission was material the Court must "look to the hypothetical contents of a 'corrected' application." Escalera v. Lunn, 361 F.3d 737,743 (2d Cir. 2004); see also United States v. Davis, No. 5:12-cr-71, 2014 WL 5305984, at *14 (D. Vt. Oct. 15, 2014) (describing the contents of a hypothetical "corrected" affidavit). "In performing the 'corrected affidavit' analysis, '[the Court] examine[s] all of the information the officers possessed when they applied for the . . . warrant.'" McColley, 740 F.3d at 823 (quoting Escalera, 361 F.3d at 744). It incorporates this information by "putting aside erroneous information and [correcting] material omissions." Rajaratnam, 719 F.3d at 146 (alterations in original) (quoting United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000)). By necessity, "the exact content of the 'remaining content' is amorphous." United States v. Rajaratnam, No. 09 Cr. 1184, 2010 WL 4867402, at *20 (S.D.N.Y. Nov. 24, 2010), aff'd 719 F.3d 139 (2013). "Therefore, the Court will draw its inferences from the totality of facts presented in the government's wiretap application as well as those omitted therefrom." Id. If, after considering the hypothetical corrected affidavit, "probable cause remains, no constitutional violation of the [defendant's] Fourth Amendment rights has occurred." Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999) (quoting Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993)).

7

Here, an issue for the Court is what does "corrected" mean? Does it extend not only to the inclusion of omitted facts, but to the overall "story" conveyed by the affidavit? If an affidavit tells a misleading story based on the proffered factual basis, does "correcting" the affidavit include not just adding the omitted facts to the extant affidavit but in fact recasting the story? Here, this question has particular relevance as the affidavit tells a story of Kenneth Levin as the central hub of a fraudulent scheme. As discussed below, while the transcripts support probable cause as to the fraudulent scheme, they do not support a story that casts Kenneth Levin as the leading actor in that drama. Nevertheless, the law in this area is concerned with the existence of a factual basis for a finding of probable cause – not the narrative into which such facts are placed. Cf. Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." (quoting United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985))). The Court therefore focuses on the facts apart from the "story" told in the affidavit.

III.   DISCUSSION

As discussed above, the Court must consider all of the information Inspector Cerecedo possessed when he applied for the warrant and determine whether the information omitted from the affidavit that supported that warrant was clearly critical to the determination of probable cause.

A. <u>Inspector Cerecedo's Affidavit</u>

In his affidavit in support of a warrant, Inspector Cerecedo described United Marketing as "a business opportunity firm that sells soda and snack vending machines to consumers across the country." (ECF No. 83-1 ¶ 4.) Inspector Cerecedo attested that although United Marketing was incorporated in 2008, "the principals of the firm [defined elsewhere as Kenneth and Taylor Levin] have continuously operated similar business in prior years under a number of other names." (<u>Id.</u>)

Several paragraphs of the affidavit provided background on the business opportunity industry, or as Inspector Cerecedo termed it, "Biz Ops." (<u>Id.</u> ¶ 7.) These paragraphs asserted that employees of business opportunity firms "typically misrepresent the length of time it has taken prior purchasers to earn back their investments," while the truth is that customers "typically earn little or no money from such opportunities." (<u>Id.</u> ¶ 8.) The affidavit also identified other ways that "such firms" or "[s]ome business opportunity firms" mislead prospective buyers, (<u>Id.</u>) and represented that the firms "typically close their doors within a year . . . to avoid unwanted government attention, neutralize complaints about the old firm, and to portray the new Biz Op as clean to potential purchasers." (<u>Id.</u> ¶ 9.)

After the paragraphs discussing business opportunity firms generally, the rest of Inspector Cerecedo's affidavit was largely attributable to a person identified as cooperating individual one ("CI-1"). (<u>Id.</u> ¶14.) As part of "a plea agreement whereby CI-1 agreed to plead guilty to conspiracy to commit mail fraud," (<u>Id.</u>) CI-1 "went to work as a salesman for United Marketing" and both listened to and recorded United

9

Marketing employees. (Id. ¶ 15.) Inspector Cerecedo reported that he had "listened to the recordings that CI-1 made of his conversations with United Marketing employees and [had] spoken with CI-1 about his dealings with United Marketing employees." (Id.)

The affidavit described particular occasions on which United Marketing employees misled prospective buyers by representing that certain locations were available for the customer to install his or her machines. (Id. ¶¶ 20, 21, 39.) It also described the role of a second cooperating individual ("CI-2") who acted as a locator and would communicate with potential buyers and confirm the location availability the United Marketing employee had described. (Id. ¶¶ 19-22, 28-29.)  After Inspector Cerecedo searched CI-2's residence in connection with his work for United Marketing and other business opportunity firms, CI-2 "admitted that he lied to prospective United Marketing buyers about the availability of locations in their area" and "said he did so in coordination with United Marketing employees, including Taylor Levin, Kelly Chase, James Conley, Jonathan Campbell, Stephen Friedman, and Sears Hobbs." (Id. ¶ 37.)

The affidavit described a December 8, 2010 conversation between CI-1 and Kenneth Levin, United Marketing's owner. (Id. ¶¶ 24-27.) The affidavit recounted Kenneth Levin stating to CI-1 that one locator that worked with United Marketing would tell established customers that additional locations for machines were available but that another locator would not. (Id. ¶ 25.)

The affidavit also recounted that "Levin told CI-1 that he is very careful about what his salespeople say over the telephone about locations" and that Levin stated that salespeople at United Marketing "had to stay 'clean' because one out of ten calls is a state attorney general's office calling to listen to the sales pitch." (Id. ¶ 26.) Inspector Cerecedo opined that "[b]y knowingly leading consumers to believe that there are locations secured in the consumer's local area – even if he does not explicitly say the locations have been secured, Levin has the intent to fraud." (Id.) The affidavit further stated that "Levin acknowledged that salespeople falsely tell prospective buyers about a 'five machine route and a ten machine route' in their area, and [a locator who was a confidential informant] is told to corroborate that false story when he speaks with potential buyers." (Id.)

The affidavit recounted two sales tactics Kenneth Levin advised CI-1 to use: using a road atlas to identify locations near the caller and telling potential buyers that other prospective buyers existed in the same area. (Id. ¶ 27.)

Later in the affidavit, Inspector Cerecedo recounted a conversation in which "Kenneth Levin told CI-1 that United Marketing does not use shills – references who falsely claim to own machines, to promote their business opportunity," but also stated "that it was ok for CI-1 to falsely tell potential buyers that he personally owned a number of machines, even though he did not." (Id. ¶ 45.)

The affidavit described evidence from "[t]he FTC's Consumer Sentinel database . . . that the business now known as 'United Marketing' changes its name every year or so." (Id. ¶ 49.) The affidavit identified other businesses affiliated with

11

Kenneth Levin and United Marketing's address dating back to May 2000, (Id. ¶¶ 49-50) and recounted a recording on which "Levin told CI-1 that he believed that recasting the firm under a new name eliminated the requirement to disclose the names of recent purchasers to new prospective buyers" (Id. ¶ 51).

The final section of the affidavit described the reasons Inspector Cerecedo believed that probable cause existed to search the documents and computer files found in United Marketing's offices (Id. ¶¶ 52-57.) and the search methods he proposed to use. (Id. 58-63.)

B.   Omitted Materials

Kenneth Levin's motion to suppress identifies a number of statements from the transcripts of CI-1's recordings that were not included.  The majority of the omitted statements concern three broad topics:  first, Kenneth Levin's role in the company; second, how United Marketing's salespeople described the profits their customers could expect; and third, the honesty of the locators that worked alongside United Marketing.

1.   Kenneth Levin's Policies at United Marketing

The full transcript of CI-1's recordings of Kenneth Levin and of United Marketing employees discussing Kenneth Levin indicates that Levin was far more concerned with avoiding criminal behavior than Inspector Cerecedo's affidavit portrayed him to be.  He emphasized the need for United Marketing employees to "stay clean" and for himself to "stay out of trouble," even if that meant lower sales. (TR_749.) He discussed the need to establish lines and stay on the right side of them

and told CI-1 that he had fired people for lying on their sales calls. (TR_758.) He contrasted an earlier era, when "you could put a lot of heat on the sale," with today, when "you can't." (TR_735.)

Kenneth Levin also described the steps United Marketing had taken to register in the states in which it did business (TR_676.) and to tailor its advertisements to comply with local legal requirements.  (TR_683.)  He told CI-1 that because he and United Marketing stayed "clean," they avoided fines and getting "kicked out of states."  (TR_749.)

The most prominent "line" Levin insisted his salespeople not cross was telling potential customers "a timeline" for how often they would have to fill their machines, which would be disprovable statements that conveyed inferences as to profitability. (TR_724.)  Kenneth Levin repeatedly insisted in his conversations with CI-1 that although United Marketing salespeople were encouraged to tell prospective buyers the expected profit per machine "from fill-up to empty," they were forbidden to say how frequently a machine would in fact empty.  (E.g., TR_724, 750, 751.)

Nor were Kenneth Levin's possibly self-serving words the only evidence Inspector Cerecedo would have heard of Levin's compliance with the letter of the law in this respect.  At least some of the salespeople CI-1 recorded spoke about Levin's demands that they not lie on phone calls.  For example, one salesman, Stephen Friedman, stated that Levin was "very, very sensitive" to his salespeople discussing timelines for certain profits with customers. (TR_539.)  A pair of salesmen, James Conley and Jay Reed, told CI-1 that Kenneth Levin listens to their sales calls and

13

will "[c]ome running out the back" if he hears a salesperson promising a timeline. (TR_100.)  More colorfully, another salesman, Richard Brown, described Levin as "a fireball" who would "[c]ome in here screaming his head off" if he heard a salesperson telling a potential customer that a machine would earn a certain profit in a certain time. (TR_478.)

### 2.     Salespeople's Descriptions of Expected Profits

The second significant category of statements that Kenneth Levin alleges were improperly omitted from Inspector Cerecedo's affidavit encompasses certain descriptions of the profits a buyer could expect from the machines.  As discussed above, Kenneth Levin repeatedly told CI-1 that he prohibited United Marketing's salespeople from promising a timeline for profits.  Other recorded conversations captured the same policy in some of the United Marketing employees.  For example, Stephen Friedman told CI-1 that "[y]ou can't say 'guarantee.' . . . You can't say 'every week.' . . . You got to say – 'full to empty.'" (TR_539.)  Sears Hobbs similarly told CI-1 that she would tell prospective buyers "how much they make when the machine is empty" but that she was "not going to tell them they make money when I have no clue." (TR_803.)  James Conley explained to CI-1 that although he would tell customers "you'll have to fill your machines at least once a week," he was "not saying they're going to empty once a week." (TR_99.)  When CI-1 asked Taylor Levin how many sales per day United Marketing employees told their customers to expect, Taylor Levin replied "We don't." (TR_640.)

### 3. The Honesty of the Locators

Kenneth Levin's motion also highlights omitted statements from three United Marketing employees regarding the connection between the company and the locators who help customers place their vending machines.  Kenneth Levin told CI-1 that one of the locators the company uses "won't say 'I've got locations available.'" (TR_689.)  Levin also told CI-1 that if he told that locator "to give the money back," he would. (TR_705.)  Taylor Levin told CI-1 that the locators United Marketing was currently working with "have a pretty good pitch where they're not saying they have locations." (TR_635.)  And Sears Hobbs told CI-1 that CI-2, the locator with whom she was working, "doesn't say it's 10 minutes in your backyard when we know it's not going to be there." (TR_801.)

### C. The Corrected Affidavit

The task for the Court is to determine whether, after "insert[ing] the omitted truths" into Inspector Cerecedo's affidavit, Rajaratnam, 719 F.3d at 146 (quoting United States v. Ippolito, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)), it still provides the basis for a finding of probable cause to search United Marketing's premises for evidence of wire fraud, mail fraud, and conspiracy to commit those crimes.  As discussed above, to establish probable cause to suspect that the premises would contain evidence of federal mail and wire fraud, the corrected affidavit must establish probable cause for the requisite specific intent, in this case the intent or contemplation of actual injury to the victims.

The hypothetical corrected affidavit paints a more complicated picture of Kenneth Levin than the portrayal that emerges from Inspector Cerecedo's affidavit. The corrected affidavit would include the details about Levin's insistence that his employees not promise potential customers profits on a particular timeline; it would also include the statements of United Marketing employees that indicate that they tended to, although did not always, obey Levin's policies in this regard; and it would also have presented information about the locators with whom United Marketing employees worked that portrayed those locators as less of a homogenous group engaged in the practices to which CI-2 admitted.

However, even with the omitted information added to the corrected affidavit – and what would necessarily be a different picture than that portrayed – there was nonetheless probable cause to search United Marketing's premises for evidence of wire and mail fraud. CI-2's admission "that he lied to prospective United Marketing buyers about the availability of locations in their area" and that he did so "in coordination with United Marketing employees, including Taylor Levin, Kelly Chase, James Conley, Jonathan Campbell, Stephen Friedman, and Sears Hobbs" remains a significant building block toward establishing probable cause. (ECF No. 83-1 ¶ 37.) CI-1's recordings confirming this coordination from United Marketing's side also remain in the corrected affidavit. (Id. ¶¶ 18-22, 36.)

The corrected affidavit would also contain evidence that Kenneth Levin was at least aware that his salespeople were promising potential buyers that routes in particular areas were available without knowing whether this was true and that he

16

encouraged CI-1 to use a road atlas to do the same in his calls. (Id. ¶ 27.) The Second Circuit has established that evidence that a participant was aware of misrepresentations in a sales presentation prior to delivering it can suffice to prove an intent to defraud beyond a reasonable doubt. See United States v. Autuori, 212 F.3d 105, 116 (2d Cir. 2000). Kenneth Levin's awareness that his salesforce was misrepresenting the availability of profitable locations is therefore sufficient to support a finding of the much lower standard of probable cause to believe that he, as well as the other United Marketing employees, contemplated that buyers would not receive the benefit they had bargained for and would thereby be injured. See Starr, 816 F.2d at 98; Regent Office Supply Co., 421 F.2d at 1179.

To the extent that Sears Hobbs independently challenges the finding of probable cause to search her private office within the United Marketing premises, see Chuang, 897 F.2d at 649-50; United States v. Crostin, No. CRIM 3:05-CR-38, 2006 WL 2522377, at *4-6 (D. Conn. July 21, 2006), the same result obtains. Although the corrected affidavit would recognize that CI-1's recordings of Hobbs were less extensive than his recordings of other United Marketing employees, it would still note that CI-2 admitted to coordinating with her, that Kenneth Levin was recorded stating that Hobbs used a similar "five machine ten machine" technique to the other United Marketing salesmen, (TR_670.) and that CI-1 recorded her telling a potential customer that there were two routes available in his area and then seemingly acknowledging that this was not the case after the call. (TR_795, 799.)

These facts would have provided probable cause to include Hobbs's private office in the search of United Marketing's premises.

The hypothetical corrected affidavit would thus have contained "such facts as make wrongdoing or the discovery of evidence thereof probable." Walczyk, 496 F.3d at 157.  It follows that the statements omitted from Inspector Cerecedo's warrant, although potentially misleading to omit, were not material insofar as their inclusion does not extinguish probable cause to search United Marketing's offices.

Kenneth Levin's motion to suppress, which Taylor Levin, Sears Hobbs, and James Conley moved to join, is therefore DENIED.  A Franks hearing is unnecessary.  The Clerk of the Court is directed to terminate the motions at Docket Nos. 82 and 85.


SO ORDERED.

Dated:     New York, New York
           September 23, 2015

_____
     KATHERINE B. FORREST
     United States District Judge